STASS REED AND MARTHA REED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5485–67, 406–68. Filed October 8, 1970.

*Benton Alpert* and *Gerald W. Keil*, for the petitioners.
*Stanley Goldberg* and *Patrick Whelan*, for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in the petitioners' Federal income tax for the taxable years 1961, 1962, 1963, and 1965 in the amounts of $11,455.53, $7,223.44, $115.85, and $1,312.36, respectively.[1] Due to certain concessions by the petitioners, the sole issue for our decision concerns whether the respondent erred in disallowing deductions of legal fees and related expenses under sections 162 and 212 of the Internal Revenue Code of 1954.[2]

FINDINGS OF FACT

Some of the facts were stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference.

---

[1] Docket No. 5485–67 involves 1961, 1962, and 1963; docket No. 406–68 involves 1965. By joint motion of the parties these cases were consolidated for purposes of trial, briefing, and opinion.

[2] All references by section are to the Internal Revenue Code of 1954 unless otherwise stated.

Stass and Martha Reed, husband and wife (hereinafter referred to as petitioners or Stass and Martha individually), maintained a residence in New York, N.Y., at the time the petitions herein were filed, but they were legally domiciled in Monte Carlo, Monaco, France. They filed joint Federal income tax returns for the years in question with the district director of internal revenue, Manhattan, New York.

Martha's father, Thomas A. Cuneo (hereinafter Thomas), died testate on September 30, 1959, in Memphis, Tenn. Thomas' last will and testament created two trusts: (1) A marital trust for his wife, Zadie S. Cuneo (hereinafter Zadie), giving her a life estate with a testamentary general power of appointment over corpus; and (2) a residuary trust for the life of Martha, providing for the payment to her of all of the net income of the trust. The will provided that during Zadie's life this amount was to be at least $400 per month and if insufficient income were generated the testator's trustees were directed to invade corpus. After Zadie's death the monthly payments were to be increased to a maximum of $1,000 per month with any surplus of income to be added to corpus. The testator's trustees were authorized "to encroach on the corpus for sickness and other emergencies as is necessary and for the proper support and maintenance of my daughter." Thomas' will further provided:

If, at the death of my daughter without issue, my wife and my sisters have predeceased her, my daughter shall have the power in her Last Will and Testament to appoint the corpus of this trust, at its termination, to her estate or to any person or persons that she may designate.

The Union Planters National Bank of Memphis, Tenn., was named in the will as executor and trustee of the above-described trusts.

The principal asset in Thomas' estate was a 30.66-percent interest in a partnership operating in Memphis, Tenn., and elsewhere under the name of Robilio & Cuneo, comprising also the Mid-South Macaroni Co. and Ronco Foods (hereinafter this partnership will be referred to as R & C). Zadie owned a 19.34-percent interest in R & C. The remaining 50 percent of R & C was owned by members of the Robilio family.

Under the terms of his will Thomas authorized his executor to sell his interest in R & C:

on whatever terms and at whatever price it deems to be to the best interests of my estate; provided, however, that this interest shall not be sold without first giving my wife an opportunity either to purchase this interest or to sell her interest on the same terms and conditions that my Executor has agreed to sell my interest.

Zadie having decided not to buy the 30.66-percent interest in R & C, a contract of sale was entered into on March 3, 1960, for its sale by Thomas' estate to the Robilio family for $317,000, $149,000 in cash and the balance payable with 6-percent interest from October 1, 1959,

over a period of 12 years. The aforesaid purchase price specifically included "all profits, or other sums due the estate by the surviving partners."

On September 9, 1960, a new partnership agreement was entered into between Zadie and the Robilios, retroactive to October 1, 1959. This partnership agreement provided that Zadie could not transfer her interest without first offering the Robilios an option to purchase. The agreement limited the purchase price to book value plus 10 percent and, further, provided that no value would be assigned to goodwill, trade name, or going-concern value.

During the period of negotiations Zadie was suffering from incurable cancer. She died, testate, of cancer on November 1, 1960. Zadie's last will and testament, which was filed with the Probate Court on November 4, 1960, after providing for several specific bequests amounting to $13,500, directed that the residue of her estate go to Martha. In addition Zadie exercised the power of appointment given her by Thomas' will in Martha's favor. By virtue of Zadie's will Martha acquired the 19.34-percent interest in R & C.

Martha and Roane Waring, Jr. (hereinafter referred to as Waring), were named in Zadie's will as coexecutors, and Waring, who was Zadie's attorney, was directed to handle all legal matters pertaining to the administration of the estate.

In accordance with the terms of the trust created in Thomas' will Martha received distributions in the total amount of $78,600 through November 30, 1966.

R & C had taxable ordinary income in the following amounts for the years indicated:

| Taxable year | Amount | Taxable year | Amount |
|---|---|---|---|
| 1960 | $209,730.35 | 1963 | $393,381.02 |
| 1961 | 330,043.02 | 1964 | 543,254.91 |
| 1962 | 161,187.64 | 1965 | 563,332.16 |

In December of 1961 a complaint was filed in the U.S. District Court for the Western District of Tennessee by Chandler, Manire and Chandler of Memphis, and Davis, Polk, Wardwell, Sunderland and Kiendl of New York City, attorneys on behalf of Martha against the Robilios. The executors of Thomas' and Zadie's estates were joined as codefendants.

As a first cause of action the complaint alleged a breach of fiduciary obligation on the part of the Robilios in that the value of the 30.66-percent interest in R & C was more than $750,000, while the Robilios had represented the true value to be not more than $317,000. The complaint further alleged that demand to institute legal action had been made by Martha upon the Union Planters National Bank which had

refused to comply. The complaint asked the court to impose a constructive trust on the interest and to order the constructive trustees to reconvey it to Thomas' estate with an accounting for all profits from the purchase.

As a second cause of action the complaint alleged that the partnership agreement of September 9, 1960, "was grossly unfair and unjust" to Zadie. The complaint further alleged that due to poor health at the time of negotiations Zadie "was unable to understand or appreciate the nature and the significance of her acts, and was not competent to execute" the agreement; and that the Robilios were aware of this. The complaint alleges that under these circumstances it was a breach of fiduciary duty for them to enter into the agreement. The complaint sought to have the court rescind the agreement based on the above allegations.

After a lengthy trial the District Court on December 21, 1965, dismissed the case for lack of diversity jurisdiction. The case is reported as *Reed* v. *Robilio*, 248 F. Supp. 602 (W.D. Tenn. 1965). On appeal the court was reversed on the question of diversity jurisdiction and the case was remanded for decision on the merits. *Reed* v. *Robilio*, 376 F. 2d 392 (C.A. 6, 1967).

On remand the District Court entered an opinion and judgment finding for the defendants on September 13, 1967. *Reed* v. *Robilio*, 273 F. Supp. 954 (W.D. Tenn. 1967). This decision was affirmed by the U.S. Court of Appeals for the Sixth Circuit. *Reed* v. *Robilio*, 400 F. 2d 730 (C.A. 6, 1968).

Stass acted for and on behalf of his wife in connection with all aspects of the litigation against the Robilios. It was Stass who employed the various attorneys who participated in the case.

The parties stipulated that the petitioners have substantiated the expenditure of the following amounts for attorneys, in New York and Memphis, incident to the prosecution of the case against the Robilios:

| 1961 | 1962 | 1963 | 1965 |
|------|------|------|------|
| $33, 244. 12[3] | $6, 275. 87 | $6, 050[4] | $10, 272. 42 |

During 1961 Stass was attempting to start an orthopedic shoe factory in France. It was necessary on several occasions for him to journey to Memphis in order to attend to matters arising out of the commencement of litigation there. During that year the petitioners

---

[3] On their income tax return for 1961 the petitioners deducted attorneys' fees of $34,107. Of this amount only $33,244.12 was substantiated and no evidence was offered concerning the difference.

[4] On their Federal income tax return for 1963 the petitioners deducted only $583 as attorneys' fees. The additional amount substantiated was not explained to the Court by the parties.

expended $3,643.77 in air fare. A substantial part of the expenditure was occasioned by the cost of Stass' flights from France to Memphis. It was stipulated that the petitioners have substantiated the foregoing expenditure.

In addition to the attorneys' fees of $6,275.87 expended during 1962 the parties stipulated that the petitioners have substantiated the expenditure of the following amounts in connection with the Robilio case during that year:

| | |
|---|---:|
| Appraisal fee | $185.00 |
| Probate Court, Memphis, Tenn | 57.00 |
| Travel expenses | 400.12 |
| Telephone calls | 345.50 |
| Total | 987.62 |

During 1963, in addition to the payment of $6,050 in attorneys' fees, the parties stipulated that the petitioners have substantiated the expenditure of $746 and $37 for telephone calls and stenographic service, respectively, during that year in connection with the Robilio case.

In addition to the attorneys' fees of $10,272.42, the parties stipulated that the petitioners have substantiated expenditures during 1965, in connection with the Robilio case, of the following amounts:

| | |
|---|---:|
| Airline travel [5] | $2,059.83 |
| Hotel bills [6] | 514.73 |
| Messenger and stenographic services | 140.00 |
| Telephone | 1,302.00 |
| Total | 4,016.56 |

During 1966 the petitioners received partial reimbursement in the amount of $14,910.26 from Zadie's estate for expenses incurred in the case against the Robilios.

On schedules attached to their 1961, 1962, 1963, and 1965 Federal income tax returns the petitioners claimed deductions in the amounts of $37,750.77, $7,263.49, $1,366, and $14,288, respectively, as expenses incident to the lawsuit against the Robilios.

The respondent in his notices of deficiency disallowed the above-mentioned deductions in full.

### OPINION

This case presents the oft-litigated question of the deductibility of attorneys' fees and related expenses. Although the statutory scheme

---

[5] Most of the expenditures in this category were for travel between New York and Memphis.

[6] These bills were in the main for accommodations in Memphis.

is deceptively simple, the answers have become obfuscated by the plethora of tests and distinctions set forth by the decided cases.

Section 212 provides, in part:

**SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.**

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income:

(2) for the management, conservation, or maintenance of property held for the production of income; * * * [7]

Section 1.212–1(k) of the Income Tax Regulations illustrates the foregoing provision by providing that "Expenses paid or incurred in defending or perfecting title to property, in recovering property * * * or in developing or improving property," are not deductible. Section 1.263(a)–2(a) of the regulations states the obvious corollary by providing generally that "The cost of acquisition * * * of * * * property having a useful life substantially beyond the taxable year" is a capital expenditure.[8]

It is the respondent's primary contention herein that the amounts deducted by the petitioners are within the above prohibitions and are, therefore, nondeductible. The petitioners argue that they are entitled to the deduction by virtue of section 212 or 162.[9] It is our task to determine whether the contested expenses pertain to income, and are therefore deductible, or to title and are therefore capital in nature, hence nondeductible. See *Robert L. Wilson*, 37 T.C. 230, 233 (1961), affirmed per curiam 313 F. 2d 636 (C.A. 5, 1963). By so stating the task we intend to indicate our determination not to resolve the issue at hand on whether the expenses were, or were not, of a nondeductible personal nature. See *Marion A. Burt Beck*, 15 T.C. 642 (1950), affirmed per curiam 194 F. 2d 537 (C.A. 2, 1952).

The facts are in large part uncontested. When the petitioner Martha's father, Thomas, died, the major asset in his estate was a 30.66-percent interest in the R & C partnership. At that time Martha's mother, Zadie, owned a 19.34-percent interest in the same partnership. The remaining 50 percent of R & C was owned by the Robilio family.

---

[7] Sec. 162(a), I.R.C. 1954, must be construed in *pari materia* with sec. 212. If the deduction is not allowed under sec. 212, it cannot be allowed under sec. 162(a). See *United States* v. *Gilmore*, 372 U.S. 39, 49 (1963) and *Trust of Bingham* v. *Commissioner*, 325 U.S. 365, 373, 374 (1945), discussing secs. 23(a)(1) and 23(a)(2), I.R.C. 1939, the predecessors of secs. 162(a) and 212; see also *Spangler* v. *Commissioner*, 323 F. 2d 913, 919 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, which discusses secs. 162(a) and 212 as well. As will become apparent from our final conclusion, it is therefore unnecessary for us to discuss the application of sec. 162(a) here.

[8] These portions of the respondent's regulations have been approved and applied in many instances. *Woodward* v. *Commissioner*, 397 U.S. 572, 575 (1970); see also *Estate of Joseph P. Morgan*, 37 T.C. 31, 36 (1961), affirmed on this point 332 F. 2d 144 (C.A. 5, 1964).

[9] See fn. 7 *supra*.

Thomas' will provided for the creation of two trusts: (1) A marital trust for Zadie, giving her a life estate with a testamentary general power of appointment over corpus; and (2) a residuary trust for Martha's life, providing for the payment to her of a minimum $400 per month for the life of Zadie and after Zadie's death a *maximum* of $1,000 per month. The will authorized Thomas' executor, Union Planters National Bank, to sell his 30.66-percent interest in R & C after giving Zadie an option to purchase his interest or to sell her own interest in the partnership. Zadie chose not to purchase this additional interest in R & C and Thomas' estate sold it to the Robilios for $317,000 on March 3, 1960.

On September 9, 1960, Zadie entered into a new partnership agreement with the Robilios respecting her own 19.34-percent interest. This agreement, in essence, provided that Zadie could not transfer her interest in R & C without first giving the Robilios an opportunity to purchase at a price equivalent to the book value of the partnership's tangible property plus 10 percent.

Zadie died on November 1, 1960, and in her last will and testament named Martha as her residuary legatee. In addition Zadie exercised the power of appointment given her by Thomas' will in Martha's favor. By virtue of Zadie's will Martha became the owner of a 19.34-percent interest in R & C. Martha was named coexecutrix of Zadie's estate with Zadie's attorney, who was directed to handle all legal matters pertaining to the estate.

In December of 1961, a complaint was filed in the U.S. District Court for the Western District of Tennessee on behalf of Martha. The complaint alleged two causes of action (hereinafter referred to as first cause of action and second cause of action). The first, pertaining to the 30.66-percent interest in R & C, alleged that the Robilios had misrepresented the value of the interest and sought to have a constructive trust imposed on the interest with an order requiring reconveyance to Thomas' estate with an accounting for profits from the time of purchase. The second cause of action sought to have the partnership agreement between Zadie and the Robilios rescinded primarily due to the allegation that the Robilios had taken advantage of Zadie's alleged incompetency.

After lengthy litigation both in the District Court and in the U.S. Court of Appeals, final adjudication was favorable to the defendants and against Martha.

As a result of this litigation, petitioner Stass, who took primary responsibility for the conduct of the case, incurred the considerable attorneys' fees, travel, and other related expenses at issue here.

In determining whether legal expenses should be treated as a current deduction or a capital or personal expenditure, the courts have

pursued two basic courses of inquiry: The primary-purpose test and the origin-of-the-claim test. See, e.g., *Industrial Aggregate Co.* v. *United States*, 284 F. 2d 639 (C.A. 8, 1960), reversing and remanding an unreported case (D. Minn. 1959, 3 A.F.T.R. 2d 1207, 59–2 U.S.T.C. par. 9487); *Lewis* v. *Commissioner*, 253 F. 2d 821, 827 (C.A. 2, 1958), affirming 27 T.C. 158 (1956); and *Samuel Galewitz*, 50 T.C. 104 (1968), which apply the primary-purpose test, and *United States* v. *Gilmore*, 372 U.S. 39 (1963); *Woodward* v. *Commissioner*, 397 U.S. 572, 575 (1970); *Anchor Coupling Co.* v. *United States*, 427 F. 2d 429 (C.A. 7, 1970), reversing an unreported case (N.D. Ill. 1969, 23 A.F.T.R. 2d 69–1407, 69–1 U.S.T.C. par. 9347); *Helgerson* v. *United States*, 426 F. 2d 1293 (C.A. 8, 1970), reversing and remanding *Powell* v. *United States*, 294 F. Supp. 977 (D. S.D. 1969), and *Spangler* v. *Commissioner*, 323 F. 2d 913, 918 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, which apply the origin-of-the-claim test.

Simply stated the primary-purpose test is:

if the primary or sole purpose of the suit is to perfect or defend title, the expenditures are not deductible. * * * [citations omitted] On the other hand, even though title may be involved, if its defense or perfection is not the primary purpose of the litigation, the expenditures do not encounter the barrier of the regulation's standard and they may qualify instead as ordinary and necessary expenses. * * * [citations omitted. *Industrial Aggregate Co.* v. *United States*, *supra* at 645.]

The origin-of-the-claim test was first specifically propounded by the Supreme Court in *United States* v. *Gilmore*, *supra*, where the question of business versus personal litigation costs was resolved by turning to "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer." [10] *United States* v. *Gilmore*, *supra* at 49.

The test was again applied by the Supreme Court in *Woodward* v. *Commissioner*, *supra*, where it was called upon to determine whether expenses in connection with appraisal litigation were capital expenditures incurred with respect to the acquisition or disposition of a capital asset. The Supreme Court commented on the primary-purpose test as follows, at page 577:

We agree with the Tax Court and the Court of Appeals that the "primary purpose" test has no application here. That uncertain and difficult test may be the best that can be devised to determine the tax treatment of costs incurred in litigation that may affect a taxpayer's title to property more or less indirectly, and that thus calls for a judgment whether the taxpayer can fairly be said to be "defending or perfecting title." Such uncertainty is not called for in applying the regulation which makes the "cost of acquisition" of a capital asset a capital

---

[10] See also *Lykes* v. *United States*, 343 U.S. 118, 125–126 (1952), the precursor of *Gilmore*, in which the Supreme Court refused to consider the consequences of litigation and in effect looked to the origin of the claim.

expense. In our view application of the latter regulation to litigation expenses involves the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself.

These two decisions of the Supreme Court were very recently discussed by the Seventh Circuit in its decision in *Anchor Coupling Co.* v. *United States, supra* at 432–433, in the following terms:

> However, the [Supreme] Court did not intimate the extent to which the primary purpose test, as applied to costs incurred in protecting ownership, has been rejected by the adoption of an objective standard of deductibility in *Gilmore* and *Woodward.*[4] We are convinced that the considerations which prompted the Court to announce such a test in these cases also impel us to fashion a similar test for determining whether the settlement payment in this case is a business expense or a capital expenditure.
>
> In so doing we rely particularly on *Gilmore*. Taxpayer argues that *Gilmore* is inapplicable because we are asked here to determine whether a settlement constitutes an ordinary and necessary business expense or a capital outlay and not whether a payment is a deductible business expense or a nondeductible personal expense. We disagree. Although the two questions are admittedly different substantially the same problems arise in each determination. * * *
> [Footnote omitted.]

See also *Helgerson* v. *United States, supra*, wherein the Eighth Circuit relied on the *Woodward* decision in applying the origin-of-the-claim test where the property was sold, rather than acquired.

In our view the Supreme Court's holding in *Woodward*, requires us to apply the origin-of-the-claim test to the expenses arising out of the first cause of action in *Reed* v. *Robilio*. This, in turn, requires a decision for the respondent. In that first cause of action the petitioners were attempting to obtain title to the 30.66-percent interest in R & C. The complaint filed on behalf of Martha with the District Court sought an order of reconveyance. It is manifest that this would require a conveyance of title to the interest. Not only was "the origin of the claim litigated * * * in the process of acquisition itself," but the litigation was a direct attempt to acquire. *Woodward* v. *Commissioner, supra* at 577.

It is axiomatic that costs of acquisition are not deductible. The mere fact that the petitioners were unsuccessful in their attempt does not render the expenditure a deductible expense. *Radio Station WBIR, Inc.*, 31 T.C. 803, 814 (1959).

As additional support for our conclusion that the expenditures relative to the first cause of action were in the nature of a capital expenditure we would note that the complaint sought reconveyance of the 30.66-percent interest in R & C to Thomas' estate. Thomas' will provided that Martha's income interest was to be limited to $1,000 per month after Zadie's death with any excess of income to be added

to corpus. Thus it appears that success in requesting the reconveyance would create little possibility of an increase in Martha's income.

On brief the petitioners argue that an increase in the corpus of the estate would have had the effect of increasing the estate's income and if Martha had encountered a need for "extraordinary amounts for sickness or other emergencies" she would have received additional income. We do not find this contention persuasive. The petitioners are advancing possibilities which are too speculative to affect the fundamental capital nature of the origin of the expenditures at issue.

The request for an accounting for profits was merely incidental to the request for title. As we have described the complaint in our Findings of Fact it is evident that Martha's success in obtaining an accounting was wholly dependent upon her procuring title. It would be unreasonable to suggest that this incidental request could bring the totality of expenditures incurred in pursuance of the first cause of action within the realm of deductibility. Neither have we been given sufficient facts from which to arrive at a reasonable allocation. See *Joseph Lewis*, 27 T.C. 158, 165 (1956), affd. 253 F. 2d 821 (C.A. 2, 1958).[11]

The respondent also argues that the expenditures incurred by the petitioners with respect to the first cause of action were on behalf of Thomas' estate and, if they were held to be deductible expenses, the estate and not the petitioners would be entitled to the deduction. Due to our decision that the legal fees pertaining to the first cause of action are in the nature of capital expenditures, we deem it unnecessary to decide the question.

Turning now to consideration of the second cause of action, although the question is not entirely free of conceptual difficulties, we find that the applicable litigation expenditures can most appropriately be characterized as "Expenses paid or incurred in * * * perfecting title to property." Sec. 1.212–1(k); see also sec. 1.263(a)–2(c), Income Tax Regs.

In so holding we apply the "origin and character of the claim" test and cite in support thereof the *Woodward* decision as interpreted in *Anchor Coupling Co.* We accept here the objective standard for deductibility and have rejected all overtures to consider Martha's motive in bringing this second cause of action.[12]

---

[11] It is perhaps worth noting that in *Joseph Lewis*, the Tax Court and the Court of Appeals applied the primary-purpose test. In *Lewis* the taxpayer was defending title rather than attempting to acquire it. In our view application of the primary-purpose test with respect to the first cause of action would have availed the petitioners nothing. We are convinced that Martha's primary purpose in instituting the first cause of action was to acquire title.

[12] Since it appears to us that Martha's motive or primary purpose in bringing her second cause of action against the Robillos was to procure a more acceptable selling price, we have serious doubts that any analysis of her motive would have changed our result.

Distilled to its essence the petitioners' second cause of action against the Robilios was an attempt to remove restrictions upon the possible future sale of the 19.34-percent interest in R & C belonging to Martha. Although Martha at the time the litigation was instituted was possessed of title, see *Matthews* v. *United States*, 425 F. 2d 738 (Ct. Cl. 1970), she was lacking an important incident of ownership. By virtue of the partnership agreement entered into by Zadie, Martha was deprived of the right to sell her interest to whom she pleased at any price she desired. Without becoming embroiled in technical questions of title, these facts indicate that Martha's ownership of the property was less than complete.[13] It was not her income interest in the partnership that was affected—not the fruit but the tree itself.

It follows, therefore, that the origin is directly related to the capital asset underlying the partnership agreement, hence the expenditures were capital in nature. Without considering the potential consequences of the lawsuit, the suit itself had its roots in the acquisition process, i.e., an option to purchase. Cf. *Anchor Coupling Co.* v. *United States*, *supra* at 433; see also *Helgerson* v. *United States*, *supra; Third National Bank of Nashville* v. *United States*, 427 F. 2d 343 (C.A. 6, 1970), reversing an unreported case *Stempfel (formerly Howard)* v. *United States*, (M.D. Tenn 1969, A.F.T.R. 2d 69–684, 69–1 U.S.T.C. par. 9238).

Due to the fact that Martha's income interest was not affected by the restriction on transfer it follows that section 212 cannot apply to expenditures incurred in the attempt to remove that restriction. Subsections (1) and (3) of section 212 clearly do not apply; and the terms "management," "conservation," and "maintenance" contained in subsection (2) have been construed to refer to actual protection of physical assets; hence that subsection is equally inapplicable. *United States* v. *Gilmore*, *supra* at 44; *Spangler* v. *Commissioner*, *supra* at 919 fn. 14.

As we stated above, since the petitioners have failed to qualify their deductions under section 212, section 162(a) can offer no succor. *Spangler* v. *Commissioner*, *supra* at 919. Therefore,

*Decisions will be entered for the respondent.*

---

[13] We deem the fact that the petitioner's legal title was unaffected to be immaterial; it is sufficient that the partnership agreement cast an equitable shadow on her interest. *Estate of Joseph P. Morgan*, *supra* at 37.