ESTATE OF NELLE W. KINCAID, DECEASED, JANE K. JOHNSON and JOAN D. KINCAID, CO-EXECUTRICES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kincaid v. Commissioner
Docket No. 14706-82.
United States Tax Court
T.C. Memo 1986-543; 1986 Tax Ct. Memo LEXIS 61; 52 T.C.M. (CCH) 1003; T.C.M. (RIA) 86543; November 12, 1986. Paul E. Sullivan,James Park, Jr.,C. Christopher Trower and Scott W. Dolson, for the petitioner. Andrew W. Winkler, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $106,882.83 and $18,431.14 in Nelle W. Kincaid's Federal income taxes for 1978 and 1979, respectively. After concessions, [1] the remaining issue concerns the deductibility of certain legal fees paid by Nelle W. Kincaid during the years in issue. *63 FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulation are incorporated in our findings by this reference. Nelle W. Kincaid (Nelle Kincaid) resided in Lexington, Kentucky, at the time her petition was filed. She filed 1978 and 1979 Federal income tax returns with the Internal Revenue Servuce Center in Memphis, Tennessee. She died in June 1984, and her estate was substituted in this case as petitioner. She was survived by two daughters (the daughters), who were her sole beneficiaries. In February 1964, Nelle Kincaid's husband, Garvice D. Kincaid (Garvice Kincaid), executed a Trust Agreement (the Trust) in which he agreed to transfer certain of his holdings and other property to Central Bank and Trust Company (Central Bank), the trustee. The trustee was bound to follow the advice and instructions of an Advisory Committee. In general, the trustee was required to "pay the net income from such property in monthly installments or otherwise as it is instructed by the Grantor [Garvice Kincaid] to or for the benefit of the Grantor for and during his lifetime." Upon the death of Garvice Kincaid and if he were survived by Nelle Kincaid, *64 the trust estate, which included the principal and income already in the Trust as well as the property passing to the Trust from Garvice Kincaid's estate, would be divided into a marital part and a nonmarital part pursuant to the instructions and directions of the Advisory Committee. The Advisory Committee would allocate the estate's assets as necessary to achieve maximum benefit of the allowable estate tax marital deduction. The marital part would then be divided, pursuant to the sole discretion of the Advisory Committee, into two separate trusts of equal shares designated Fund A and Fund B. The remainder of the trust estate, the nonmarital part, would become a trust designated Fund C. In such case, the trustee was directed to pay the net income from Fund A to Nelle Kincaid during her lifetime. She had the additional right to receive out of Fund A as much as $20,000 of principal per year provided she executed a written request, and she also had the power to appoint the principal of Fund A upon her death. At its discretion, the Advisory Committee could direct to Nelle Kincaid (during her lifetime) the payment of any amount of principal from Fund A or any amount of net income *65 or principal from Fund B. Upon the death of Nelle Kincaid, the accumulated income and principal of Fund B would be distributed to the executors of her estate. Distributions of income or principal out of Fund C also rested within the sole discretion of the Advisory Committee. Eligible recipients under Fund C included Nelle Kincaid, the daughters, and a few others who met specific conditions. Pursuant to an Amendment to the Trust dated February 4, 1967, the members of the Advisory Committee, to be composed of three individuals, were specified as were three successors, none of which included Nelle Kincaid or the daughters. The amendment also included the following provision: It is the Grantor's express desire to have as members of this Advisory Committee, persons who are employed by, represent, have financial interests in, or receive compensation from, corporations in which the trusts created by this Trust Agreement have, or are likely to have, financial interests; therefore, any such employment, representation, or financial interests shall not disqualify a person from being, becoming or remaining a member of the Advisory Committee. Garvice Kincaid died testate in November 1975. *66 At the time of his death Garvice Kincaid was an attorney, a businessman, and a financier who maintained stock holdings in insurance companies, finance companies, and more than 20 banks. Among the insurance companies was Kentucky Central Life Insurance Company (KCLI), in which Garvice Kincaid owned 800 of the 961 shares of voting common stock then outstanding. One of the banks, Central Bank and Trust Company (Central Bank), was the executor of his estate. An Estate Tax Return was filed for the estate of Garvice Kincaid in August 1976. The return reported a total gross estate of approximately $16,000,000. Schedule M of the return described the following bequests to Nelle Kincaid (surviving spouse): 1. Residence
$ 100,000
2. Insurance Proceeds
261,667
3. Employment Contract
350,000
4. Interest in Marital Trust
3,597,111
$4,308,778
Because Garvice Kincaid was survived by Nelle Kincaid and the daughters, the Trust provisions described above came into play. Dur to the size of the estate and other outside factors, however, implementation of the estate plan described in Garvice Kincaid's will and Trust Agreement was a slow process. At the time of trial *67 of this case in February 1986, only a portion of the estate had been distributed to the trustee. Nelle Kincaid's personal attorney prior to and during the years in issue was Paul E. Sullivan (Paul Sullivan). Regarding Nelle Kincaid's rights under the administration of the Garvice Kincaid estate and Trust, Paul Sullivan's initial representation included attempts to gather information from the estate, to persuade the Advisory Committee and trustee to convert nonearning assets into earning assets, and to determine the extent, if any, to which there had been waste and breach of fiduciary duty and conflicts of interest. In spite of these efforts, which included negotiations and conferences with both the Advisory Committee and the trustee, Nelle Kincaid received and continued to receive proportionately less income from the Trust than she believed was her entitlement. In about December 1977, Nelle Kincaid employed the law firm of Barnett & Alagia to assist her in asserting her rights and legal claims under the Trust. Paul Sullivan provided Barnett & Alagia with research and other background documents regarding the Trust and coordinated with Barnett & Alagia in their efforts to evaluate *68 Nelle Kincaid's situation and make recommendations. Ultimate goals included a fair administration of the Trust to the intended beneficiaries and, concatenate thereto, an increase of Nelle Kincaid's income distribution. Prospective strategies included the possibility of litigating the Trust administration and the breaches of fiduciary duty and the possibility of obtaining independent valuations of the Trust assets. In connection with the unsatisfactory income distributed to Nelle Kincaid, she and the attorneys were suspicious of a low valuation of certain assets as reported on the estate tax return and as transferred to the Trust, namely the KCLI stock transferred into Fund C. Nelle Kincaid and her attorneys believed that a proportionately low amount was transferred, pursuant to the Trust formula, into the marital part, from which Nelle Kincaid was entitled to annual mandatory income distributions (out of Fund A). Moreover, Nelle Kincaid believed that the Advisory Committee was acting not to benefit her but rather themselves. For example, members of the Advisory Committee placed themselves at the head of corporations in which the Trust held an interest. Also, the only member *69 of the Advisory Committee who Nelle Kincaid felt was friendly toward her resigned in 1976 or 1977. At some time during the years in issue, at least one company offered to buy the KCLI stock, but no offer was accepted. In 1978, Nelle Kincaid paid Davidge & Company (Davidge), a firm located in Washington, D.C., to give its opinion of the date of death value of the KCLI common stock, which was valued at $485,000 on the estate tax return. In a letter dated April 5, 1978, Davidge described three approaches to value from which it concluded respective values of the block of stock of roughly 4, 20, and 80 times the value reported on the estate tax return. On December 12, 1978, a memorandum to Nelle Kincaid was prepared by Barnett & Alagia and initialed by Ronald A. Gaffney (Gaffney), an attorney with Barnett & Alagia. It described various aspects of a potential lawsuit against certain members of the Advisory Committee as well as certain members of the boards of directors of Central Bank and KCLI. Included in the memorandum were various options in terms of jurisdiction and venue and a discussion of proposed allegations. The proposed complaint (1) alleged, among other things, violations *70 of the Investment Advisory Act of 1940, conflicts of interest, breaches of fiduciary duty, and mismanagement and (2) sought, among other things, a preliminary injunction ordering the KCLI stock to be sold and a declaration of the rights of the parties under the Trust Agreement. At about that time, however, Nelle Kincaid, as a result of the financial strain, the emotional strain, and the notification she received that the Internal Revenue Service intended to challenge the deductibility of her legal fees, elected to postpone any further pursuit of litigation. During the years in issue, Paul Sullivan defended Nelle Kincaid in a lawsuit regarding title to one or more paintings. Nelle Kincaid also paid legal fees to Gess, Mattingly, Sounier & Atchinson (GMSA) during the years in issue. On her tax returns for 1978 and 1979, Nelle Kincaid reported total income of $387,188.74 and $470,984.66, respectivelyl, including distributions of income from trust Fund A of $106,316.64 and $106,114.11, respectively. On Schedules A & B of those returns, Nelle Kincaid claimed deductions for the payment of legal and accounting fees of $152,539.27 in 1978 and legal fees of $26,295.83 in 1979. Those *71 fees consisted of payments as follows: Source
Nature
1978
1979
Paul Sullivan
Legal
$ 9,192.06
$ 6,046.54
Barnett & Alagia
Legal
139,980.26
20,105.79
John Sullivan
Accounting
985.00
Davidge
Appraisal
2,508.60
GMSA
Legal
43.00
384.00
[2] $152,708.92
[3] $26,536.33
In his notice of deficiency, respondent disallowed petitioners' deductions for all of these fees except a small portion of those paid each year to Paul Sullivan. Respondent determined that Nelle Kincaid failed to establish that any of the disallowed legal and accounting expenses met the requirements of section 162 [4] or section 212. OPINION During the years in issue, Nelle Kincaid incurred legal expenses for services performed by several *72 law firms. Respondent no longer contends that the fees were not actually paid. At issue, however, is whether those expenses are deductible under section 212. Petitioner maintains that the legal fees are deductible because they were paid for the production and collection of income and for the management, conservation, or maintenance of property held for the production of income. Section 212(1) and (2). Petitioner argues that the fees were incurred because of Nelle Kincaid's dissatisfaction with the amount of income being distributed to her under the Trust and with the mismanagement and waste of the Trust assets by the trustee and the Advisory Committee. Petitioner bears the burden of proving error in respondent's determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The fees charged by Davidge were not for legal services but for its analysis and appraisal of the KCLI stock. At trial, however, it was agreed that those fees were sufficiently connected to the legal work performed by Barnett & Alagia so that the deductibility of the Barnett & Alagia fees would determine the deductibility of the Davidge fees. *73 Respondent conceded the deductibility of the accounting fees paid to John Sullivan. Although petitioner established payment of the fees to GMSA, it offered no evidence from which the Court might determine deductibility; thus, petitioner has not met its burden of proof, and the GMSA fees are not deductible. Remaining for our determination therefore is the deductibility of the fees paid to Paul Sullivan and to Barnett & Alagia. Both parties frame their arguments under the origin of the claim test, first enunciated in United States v. Gilmore,372 U.S. 39 (1963). See Woodward v. Commissioner,397 U.S. 572 (1970). If the origin and nature of the claim is personal, the legal fees are not deductible. United States v. Gilmore,supra.If the origin and nature of the claim involves the acquisition or disposition of a capital asset or the defense or protection of title, the legal fees are nondeductible capital expenditures. See Brown. v. United States,526 F.2d 135 (6th Cir. 1975); Mosby v. Commissioner,86 T.C. 190 (1986); Von Hafften v. Commissioner,76 T.C. 831 (1981); Boagni v. Commissioner,59 T.C. 708 (1973); *74 Reed v. Commissioner,55 T.C. 32 (1970). In Boagni v. Commissioner,supra, we described the origin of the claim test as follows: Quite plainly, the "origin-of-the-claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertinent to the controversy. [59 T.C. at 713. Citations and fn. ref. omitted.] Although the origin of the claim test is normally applied to legal fees associated with a lawsuit, courts have applied the test to determine the deductibility of legal fees where there was no intended or resulting litigation. In United States v. Patrick,372 U.S. 53 (1963), the Supreme Court addressed the deductibility of legal fees incurred in reaching a property *75 settlement. The Court compared the case with United States v. Gilmore,supra, which involved the deductibility of legal fees incurred in a divorce litigation over property: We find no significant distinction in the fact that the legal fees for which deduction is claimed were paid for arranging a transfer of stock interests, leasing real property, and creating a trust rather than for conducting litigation. * * * The property settlement agreement * * * although nominally an agreement for the purchase of the wife's property, it served ultimately to protect respondent's [the taxpayer's] income-producing property from an assertion of his wife's latent marital rights. It would be unsound to make deductibility turn on the nature of the measures taken to forestall a claim rather than the source of the claims itself. [372 U.S. at 57.] Thus, although the taxpayer's intent and purpose was to protect or "conserve" income-producing property, the origin of the claim was the taxpayer's marital obligations and, therefore, personal. In Estate of Davis v. Commissioner,79 T.C. 503 (1982), we addressed an issue concerning the deductibility *76 of legal fees paid for drafting an inter vivos, revocable trust instrument and for related consultation. Although the fees were wholly unrelated to any litigation, we nevertheless applied the "origin and character" test. The legal services were measures taken to avoid claims against property, and we concluded that such measures "cannot reasonably be distinguished, for purposes of section 212, from litigation in the defense of such claims." 79 T.C. at 511. Deduction of the fees was denied because the "origin of the claim against which protection was sought [by virtue of the legal services] was * * * [taxpayer's] connection with the Hughes estate, which was either capital or personal in character, depending on the character of the particular claim." 79 T.C. at 512. Although litigation was certainly an alternative seriously considered by Nelle Kincaid, the legal services attributable to the administration of the Trust did not give rise to litigation during the years in issue. Nevertheless, the objective analysis of the "origin and character" test is proper in this case. Applying this test, we conclude that the legal fees attributable to the administration *77 of the Trust and the management of its assets are deductible expenses under section 212. The origin and character of the "claim" or protection sought by Nelle Kincaid had its source in the management and conservation of income-producing property in which Nelle Kincaid held an interest as an income beneficiary. The legal fees incurred in this regard include those paid to Barnett & Alagia and a portion of those paid to Paul Sullivan. The evidence in this case indicates that Nelle Kincaid and her attorneys believed that she was receiving less than her anticipated amount of income because of mismanagement and waste of the Trust assets by the trustee and the members of the Advisory Committee. Nelle Kincaid and her attorneys believed that those parties were hostile to Nelle Kincaid and more concerned with lining their own pockets by manipulating the businesses and other activities associated with the Trust. The credible testimony of Paul Sullivan and Gaffney supports this belief. Paul Sullivan testified that, after Garvice Kincaid's death, members of the Advisory Committee began to place themselves as heads of "every one of the companies" in which the Trust held an interest. Gaffney *78 testified that a goal of his law firm was to "get what was considered a fair administration of the trust to those people who were intended to be the beneficiaries of the trust," and that prospective strategies included, among other things, the possibility of litigating both the administration of the Trust and breaches of fiduciary duty. Moreover, petitioner's contention is logical in view of the Trust plan prepared by Garvice Kincaid, which provided incentives for the members of the Advisory Committee because of their power over the Trust assets and their financial stake in the Trust's activities. All of these factors indicate that the origin and character of the protection sought by Nelle Kincaid through her legal expenses was the prevention of perceived abuses in the administration of the Trust that would be detrimental to her as the income beneficiary. Such expenses are deductible for "the management, conservation, or maintenance of property held for the production of income." Section 212(2). See Burch v. United States,698 F.2d 575, 579 (2d Cir. 1983) (taxpayer allowed deduction for legal fees incurred to protect income-producing property from excessive management *79 fees); Hendrick v. Commissioner,35 T.C. 1223, 1234-1235 (1961) (legal fees paid by remainderman of a trust to maintain surveillance over management of trust corpus held deductible); Tyler v. Commissioner,6 T.C. 135 (1946) (legal fees deductible for management or conservation of income-producing property where taxpayer, an income beneficiary of a testamentary trust, sought construction of a will to determine the amount of income payable to him under the trust). The evidence presented by petitioner, which is the basis for our findings of fact, is more than sufficient to satisfy petitioner's burden of proof. Respondent's contentions are based on suspicions not supported by evidence received or offered. First, respondent argues that the legal fees were nondeductible personal expenses under section 262, either because they were incurred in pursuit of a personal vendetta or were intended to bring property into Fund A or Fund B so that it could be passed on to Nelle Kincaid's daughters. There is absolutely no support for the theory that Nelle Kincaid was engaged in a vendetta, and her abandonment of the litigation negates such a purpose. Compare Rafter v. Commissioner,60 T.C. 1 (1973), *80 affd. without published opinion 489 F.2d 752 (2d Cir. 1974), relied on by respondent. It is arguable that proper management of the Trust would result in an allocation of more property into Fund A and Fund B and thereby benefit the daughters; however, the applicable test does not turn on the possible results of the activity giving rise to the fees. See Woodward v. Commissioner,397 U.S. at 577; Brown v. Commissioner, 526 F.2d at 138; Mosby v. Commissioner,86 T.C. at 196-197. Although the purpose and steps taken in implementing that purpose are considered in determining, as an ultimate objective fact, the origin of the claim, the subjective knowledge of possible consequences of those steps is not controlling. Respondent alternatively argues that the fees in issue were nondeductible capital expenditures under section 263 because the Barnett & Alagia efforts were aimed at forcing the sale of the KCLI stock. In support of this contention, he offered evidence of proceedings before the Kentucky Department of Insurance concerning KCLI. Objections to this evidence were sustained, and, after reconsideration, those rulings *81 are here confirmed. Although a result of the legal services might have been the sale of the KCLI stock, such sale does not negate our conclusion as to the underlying origin and character of the "protection" sought by Nelle Kincaid. Indeed, even if possible results were a proper factor, the potential effect of other litigation, argued by respondent, does not tend to prove Nelle Kincaid's state of mind or purpose in employing counsel whose fees are in dispute here. [5]
*82 Legal fees incurred to perfect or defend title are nondeductible capital expenditures. Reed v. Commissioner,55 T.C. 32 (1970). Section 1.212-1(k), Income Tax Regs., provides: (k) Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents. Expenses paid or incurred in protecting or asserting one's right to property of a decedent as heir or legatee, or as beneficiary under a testamentary trust, are not deductible. The record in this case shows that none of the Barnett & Alagia expenses served this function. Paul Sullivan's representation, however, involved both the Trust and a dispute over one or more paintings. With regard to the painting *83 dispute, Nelle Kincaid was the defendant in litigation where another individual claimed title to the paintings.Applying the "origin and character" test to the legal fees incurred with regard to this lawsuit, we conclude that a portion of Paul Sullivan's fees was nondeductible capital expenditures because their origin and nature involved title to the paintings. We must therefore allocate Paul Sullivan's fees between nondeductible expenses stemming from the painting lawsuit and deductible expenses attributable to the administration of the Trust. The evidence on such allocation consists solely of Paul Sullivan's testimony. He was unable, for reasons including the lapse of time and changes in employment, to locate and provide the Court with proper time sheets and billing documents. He testified that he could not make an independent estimate himself but admitted that he had no reason to disagree with the allocation by respondent's agent during the audit, which he understood to be approximately one-third of the fees to the title dispute and two-thirds to the Trust administration. The record thus lacks a fully satisfactory formula for allocation of the fees; accordingly, the best that *84 can be done is a "rough approximation." See Boagni v. Commissioner,59 T.C. at 715, and cases cited therein. We are convinced that a portion of Paul Sullivan's services was attributable to the Trust management and that a portion was attributable to the painting dispute, but because his testimony lacked specificity and was thus unpersuasive, we must weight the allocation heavily against petitioner.See Merians v. Commissioner,60 T.C. 187, 190 (1973). Accordingly, we conclude that 50 percent of the Paul Sullivan fees are nondeductible capital expenditures attributable to the title dispute and 50 percent are deductible legal expenses attributable to the administration of the Trust. Decision will be entered under Rule 155.
Footnotes
1. In her petition, Nelle Kincaid claimed entitlement to a deduction under section 691(c), I.R.C. 1954, as amended, for Federal estate tax attributable to income in respect of a decedent reported on her 1978 and 1979 Federal income tax returns. The parties agree that the final decision in Estate of Kincaid v. Commissioner,85 T.C. 25↩ (1985), controls the resolution of this issue.
2. The parties agree that the total of the actual expenses paid in 1978 was $152,708.92, not $152,539.27 as reported on petitioner's tax return. ↩
3. The parties agree that the total of the actual expenses paid in 1979 was $26,536.33, not $26,295.83 as reported on petitioner's tax return. ↩
4. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect at the date of death.↩
5. Compare United States v. Robinson,763 F.2d 778, 783↩ n. 8 (6th Cir. 1985). Respondent offers a specific exhibit (12-L), consisting of Findings of Fact, Conclusions of Law, and Order of the Department of Insurance of the Commonwealth of Kentucky, as showing a variety of possible reasons for the offer by one insurance company to purchase stock of KCLI. The document itself states that "the Commissioner does not intend to speculate on the intended future actions of the parties to this proceeding" and gives examples of matters that the Commissioner of Insurance regards as "common knowledge." Respondent merely states that the exhibit "shows facts and background pertinent to the controversy" without explaining the pertinence. We find that technique totally unpersuasive. Any possible probative value of this material is extremely remote and far outweighed by the direct evidence of the origin of the claim. Moreover, for the reasons explained in the text, respondent's reliance on the document reflects confusion as to the issue.